**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| KNIGHTS OF COLUMBUS, <br> COUNCIL 694, <br><br> *Plaintiff*, <br><br> v. <br><br> NATIONAL PARK SERVICE, <br><br> U.S. DEPARTMENT OF INTERIOR, <br><br> AARON SCOTT, Chief Park Ranger, <br> Petersburg National Battlefield, *in both his* <br> *official and personal capacities*, <br><br> ALEXA VIETS, Superintendent, <br> Petersburg National Battlefield, *in both her* <br> *official and personal capacities*, <br><br> *Defendants*. | Case No. 3:24cv363 _____ |

## COMPLAINT & JURY-TRIAL DEMAND

1.      Plaintiff Knights of Columbus, Council 694, have hosted an annual Memorial Day mass at the Poplar Grove National Cemetery for generations as a way to live out their faith and their patriotism by worshipping God and honoring the soldiers buried there—until last year.

2.      In 2023, Park Ranger Aaron Scott of the National Park Service ("NPS") initially granted a permit that would have allowed the Knights to hold their annual Memorial Day mass in the National Cemetery. But then on May 17, 2023, he told the Knights that, for the first time, they would be prohibited from holding the annual Memorial Day mass inside the National Cemetery, citing a 2022 Policy Memorandum which, he said, prohibits any "religious service" (other than a commital service) in a National Cemetery—even though the policy implements the same

regulations under which NPS previously approved the Knights' permit applications and NPS has permitted Memorial Day masses hosted by other councils, even under the new policy. This year, Ranger Scott and Superintendent Alexa Viets have denied the Knights' request for permission to hold their annual Memorial Day mass in the National Cemetery on the same basis.

3.      Instead, NPS insists that the Knights may have a permit only for the "First Amendment Area" outside the cemetery walls and down the hill, out of sight of the gravesites. But that is simply not an adequate substitute for holding the mass within the walls and on the sacred ground of the cemetery, as the Knights have done without incident for generations. As explained herein, the relegation of the Knights to a designated "First Amendment Area" outside the cemetery is neither required by NPS regulations nor consistent with the Knights' sincerely held religious beliefs.

4.      This denial of the Knights' requests to continue holding their annual Memorial Day mass in the cemetery violates the Administrative Procedure Act, the Religious Freedom Restoration Act, and both the Free Exercise and Free Speech Clauses of the First Amendment to the U.S. Constitution. The Court can and should act promptly to protect the right of the Knights to gather and celebrate the mass at the National Cemetery on Memorial Day, as they have done since before anyone can remember.

5.      Because Memorial Day is **Monday, May 27**, and soon approaching, the Knights will promptly ask the Court to enter a temporary restraining order requiring Defendants to grant the Knights a permit for the mass in the National Cemetery and/or to enjoin them from prohibiting the Memorial Day mass in the National Cemetery, and then after a hearing, to enter a preliminary injunction to the same effect.

## PARTIES

6.      Plaintiff Knights of Columbus, Council 694, is a local council of the Knights of Columbus, a Catholic fraternal service order with over 2 million members worldwide. The national organization is incorporated under the laws of the State of Connecticut and has its principal place of business in New Haven, Connecticut. Council 694 is headquartered in Petersburg, Virginia.

7.      Defendant U.S. Department of Interior is a federal agency located at 1849 C Street NW, Washington, DC 20240.

8.      Defendant National Park Service is a federal agency and subdivision of the Department of Interior, also located at 1849 C Street NW, Washington, DC 20240.

9.      Defendant Aaron Scott is a natural person and a Park Ranger with the National Park Service. Upon information and belief, Ranger Scott is a citizen and resident of the Commonwealth of Virginia and resides within the Eastern District of Virginia. Ranger Scott revoked the Knights' permission for their annual Memorial Day mass to be held in the National Cemetery in 2023, and refused that permission again in 2024.

10.     Defendant Alexa Viets is a natural person and Superintendent of the Petersburg National Battlefield, which includes Poplar Grove National Cemetery. Upon information and belief, Superintendent Viets is a citizen and resident of the Commonwealth of Virginia and resides within the Eastern District of Virginia. Upon information and belief, Superintendent Viets approved the decision in 2024 to deny the Knights' permission for their annual Memorial Day mass to be held in the National Cemetery.

## JURISDICTION AND VENUE

11.     Plaintiff's claims arise under federal law. *See* 5 U.S.C. § 702 (Administrative Procedure Act); 42 U.S.C. § 2000bb-1(c) (Religious Freedom Restoration Act); U.S. CONST., amend. I (Free Exercise and Free Speech Clauses of the First Amendment).

12.     This Court has jurisdiction under 28 U.S.C. § 1331.

13.     This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202; damages under 42 U.S.C. § 2000bb-1; and attorney's fees and costs under 28 U.S.C. § 2412 and 42 U.S.C. § 1988.

14.     At least a substantial part of the events or omissions giving rise to the claims has occurred and will occur in the district.

15.     Venue is proper under 28 U.S.C. § 1391(b)(2), (e)(1).

## RELEVANT FACTS

**A.     The Knights of Columbus, Council 694, Have Held an Annual Memorial Day Mass in the Poplar Grove National Cemetery, Without Incident, for as Long as Anyone Can Remember**

16.     Founded almost 150 years ago in the United States, the Knights of Columbus is a Catholic fraternal service order with over 2 million members worldwide.

17.     The Knights' guiding principles are Charity, Unity, Fraternity, and Patriotism.

18.     One long-standing way the Knights' have lived out their faith and their patriotism is by hosting Memorial Day masses.

19.     In Petersburg, the Knights have held an annual Memorial Day mass in Poplar Grove National Cemetery for generations, in accordance with their religious beliefs.

20.     The tradition is so old that Council 694 has no written record of when it first began, but living memory confirms that the masses have been celebrated at Poplar Grove since at least the 1960s, and they likely started long before.

4

21.    Until last year, the National Park Service (NPS) always granted the Knights permission to hold the mass within the cemetery, and the mass or a prayer service (when a priest was not available) had been celebrated there annually without incident.

22.    Most years, the mass has been celebrated in a gazebo with participants on a grass lawn, adjacent to the gravesites:



23.    A few years ago, the grass lawn area underwent a renovation, and the Knights were asked to relocate within the walls of the National Cemetery to a porch on the side of the main building near the entrance, just a few steps removed from the lawn:



24.     The Knights were happy to accommodate that request because the new location allowed them to remain within the walls of the National Cemetery and on sacred ground.

25.     In the entire recalled history of the Knights' annual Memorial Day mass, the event has never drawn a crowd or onlookers; nor has it caused any other sort of disruption.

26.     The Knights do not include any hymns in the annual Memorial Day mass in order to preserve an atmosphere of quiet contemplation for all, and to facilitate solemn and reverent prayer for the participants.

**B.     In 2023, Ranger Scott Initially Allowed the Knights to Hold Their Annual Memorial Day Mass in the National Cemetery, But Then Revoked That Permission Citing Policy Memorandum 22-01**

27.     In 2023, for the first time in memory, NPS denied the Knights permission to hold the service in the cemetery, citing a new policy which, according to Chief Ranger Scott, forbids a "religious service" in the cemetery as a prohibited "demonstration."

28.     For many years, the Knights had been working with Park Ranger Amanda Harwood, the Special Park Use Permit Coordinator for Petersburg National Battlefield, which includes Poplar Grove National Cemetery.

29.     On April 24, 2023, Tim Tetreault, a member of Council 694 who coordinates the annual Memorial Day mass emailed Ranger Harwood: "That time of year. Need to request a permit for this year's Memorial Day Mass at Poplar Grove."[1]

30.     On April 26, 2023, Ranger Harwood responded, copying Chief Ranger Aaron Scott: "I will be working with our new Chief Ranger on permits. I will be in touch, or he will . . . . Thank you so much for reaching out! I have attached the application."

31.     The Knights submitted their application the next day.

32.     On May 15, 2023, Mr. Tetreault sent an email inquiring about the status of the request.

33.     That same day, Ranger Scott sent the permit back to Mr. Tetreault for him to review and sign. That permit would have allowed the Knights to hold their annual Memorial Day mass on the grass lawn where it had traditionally been held.

34.     Later that day, Mr. Tetreault followed up with a question about the terms of the permit and whether NPS would waive the requirement for liability insurance.

35.     On May 16, 2023, Ranger Scott responded that he assumed it would be okay to waive liability insurance because it had been waived in the past but stated that he "would like to look into it for [his] own education."

36.     On May 17, 2023, Ranger Scott sent an email which, for the first time, stated that, based on Policy Memorandum 22-01[2] ("Managing Special Events and Demonstrations in National Cemeteries") (August 15, 2022), the Knights' annual Memorial Day mass would be treated as a "demonstration" and prohibited within the National Cemetery:

> [T]here is a Directors Order concerning National Cemeteries that is applicable to this situation, which I've attached. I realize our website has not been updated to

---

[1] A true and accurate copy of Mr. Tetreault's email correspondence with NPS officials is attached here as Exhibit 1.

[2] A true and accurate copy of Policy Memorandum 22-01 is attached here as Exhibit 2.

reflect this directive and I apologize for that. I have just recently taken over the duties concerning permits within the park.

Here are the specifics from the memo concerning your permit, you may read the attached memo in its entirety when you are afforded the opportunity:

§ 12.4 Special events and demonstrations.

Conducting a special event or demonstration, whether spontaneous or organized, is prohibited except for official commemorative events conducted for Memorial Day, Veterans Day and other dates designated by the superintendent as having special historic and commemorative significance to a particular national cemetery. Committal services are excluded from this restriction.

The term "demonstration" is defined in section 12.3 as follows:

Demonstration means a demonstration, picketing, speechmaking, marching, holding a vigil or religious service, or any other like form of conduct that involves the communication or expression of views or grievances, engaged in by one or more persons, the conduct of which is reasonably likely to attract a crowd or onlookers. This term does not include casual park use by persons that is not reasonably likely to attract a crowd or onlookers.

Outside of national cemeteries, the NPS issues special use permits for special events and demonstrations within System units. Superintendents should not issue special park use permits for demonstrations within a national cemetery because demonstrations are categorically prohibited by section 12.4.

If an activity is a demonstration, then it is prohibited by section 12.4 without exception. The allowance in section 12.4 for "official commemorative events," discussed below, is a limited allowance for special events, not demonstrations. If an individual or group is denied a request to conduct a demonstration within a national cemetery, the superintendent should evaluate whether the demonstration could occur outside of the national cemetery in a designated First Amendment area and, if so, offer that as an alternative.

37.     In the ensuing correspondence, Ranger Scott made clear that the Knights would not be permitted to hold their annual Memorial Day mass anywhere inside the walls of the National Cemetery because it was a prohibited "demonstration" but that they could potentially be given a permit for a designated "First Amendment Area" outside the cemetery, which is outlined in black

8

below (while the grass lawn where the Knights traditionally held their service is highlighted in yellow):



38.     The "First Amendment Area" is located outside the cemetery walls (and thus is not sacred ground), and it is graded well below the cemetery itself and prone to flooding. Due to the grading, the cemetery walls, and the buildings located at the entrance to the cemetery, the "First Amendment Area" also does not allow for a view of the gravesites:



9

39.     In 2023, after prayerful consideration, the Knights concluded that they could not hold their annual Memorial Day mass in the "First Amendment Area," consistent with their sincerely held religious beliefs. They instead chose to have a commemorative mass elsewhere, but as explained herein, requiring the Knights to hold their mass in the "First Amendment Area" or at another location altogether prevents them from fulfilling their sincere beliefs, substantially burdens their religious practice, and fails to provide an adequate substitute for the Knights' long-standing religious practice of celebrating the annual Memorial Day mass in the National Cemetery.

**C.      This Year, Ranger Scott and Superintendent Viets Again Prohibited the Knights from Holding Their Annual Memorial Day Mass in the National Cemetery, Citing Policy Memorandum 22-01**

40.     Defendants have invoked the Policy Memorandum 22-01 again this year as justification for denying the Knights permission to hold their annual Memorial Day mass in the Poplar Grove National Cemetery.

41.     In light of what happened in 2023, the Knights carefully considered this year whether they could hold their annual Memorial Day mass in the "First Amendment Area" *outside* the walls of the National Cemetery, consistent with their sincerely held religious beliefs. They concluded that they cannot.

42.     That conclusion is memorialized in a Resolution of Council 694, adopted February 12, 2024.[3] That resolution concludes:

> Resolved, that to be faithful to and act in accordance with the religious beliefs of this Council, we must continue to hold our annual religious memorial service on Memorial Day in the Poplar Grove National Cemetery here in Petersburg, Virginia, to include our Memorial Day Mass and from the Book of Blessings the blessing for Visiting a Cemetery on Memorial Day.

---

[3] A true and accurate copy of the February 12, 2024 resolution is attached here as Exhibit 3.

As mentioned in the resolution, the Catholic *Book of Blessings*, which is approved for use by the U.S. Conference of Catholic Bishops and confirmed by the Apostolic See, provides a specific order for visiting a cemetery on All Soul's Day (November 2), Memorial Day, or on the anniversary of a death or burial. The Knights believe that these prayers, which may properly be performed only within sacred ground of the cemetery, need to be part of their annual Memorial Day mass.

43.     The Knights first submitted their permit application for this year's mass on March 8, 2024 to Ranger Harwood and Ranger Scott.[4]

44.     Almost two months later, on Thursday, May 2, 2024, Ranger Scott responded claiming that the Knights' application was "not complete" because "[t]he times for the event set-up and removal and the activity itself are not listed and ***the area that you are requesting to use is in contradiction to policy as we discussed last year***." (Emphasis added.) He further stated that, for the first time, NPS had scheduled another Memorial Day event at Poplar Grove National Cemetery and that, even if they were to request a permit for the "First Amendment Area," the Knights' "event and clean-up afterwards would have to be completed by noon that day to avoid conflict with the other scheduled activity."

45.     On Thursday, May 9, 2024, Mr. Tetreault resent the permit application, which had already listed the time information that Ranger Scott claimed was missing, and reiterated the necessity of holding the mass in the National Cemetery:[5]

> [T]he location is important to us.  It's our religious belief that the memorial service needs to be inside the cemetery itself, not outside the cemetery somewhere.  That's why we've always had it there every year since at least the 1960s or before.  I hope we can have it there again this year.

---

[4] A true and accurate copy of this original 2024 permit application is attached here as Exhibit 4.
[5] A true and accurate copy of this email correspondence is attached here as Exhibit 5.

46.     On Monday, May 13, 2024, undersigned counsel sent a letter to Ranger Scott explaining that it would be consistent with NPS policy and established practice and urging him to reconsider his position.[6]

47.     The letter noted that, even under the new policy, NPS had granted permission for another Council of the Knights of Columbus to host their annual Memorial Day Mass in the Andersonville National Cemetery in Georgia:

> This coming Memorial Day, the Knights of Columbus will be hosting a mass in the Andersonville National Cemetery in Georgia. The mass is listed in the Memorial Day Weekend schedule on the Park Service website, see 2024 Memorial Day Weekend Schedule for Andersonville National Cemetery, https://www.nps.gov/ande/planyourvisit/memorialdayobservance.htm (last visited May 10, 2024), and the official Facebook page for the Andersonville National Historic Site, see https://www.facebook.com/AndersonvilleNPS/ (last visited May 10, 2024). The Knights of Columbus hosted a mass in the same cemetery last year, as well, also under the new policy. See Andersonville National Historic Site hosts Memorial Day weekend events, https://www.nps.gov/ande/learn/news/andersonville-national-historic-site-hosts-memorial-day-weekend-events.htm (last visited May 10, 2024).

48.     The letter further explained that refusing the Knights a permit to hold their annual Memorial Day mass in the National Cemetery on the basis that it is a "religious service" and therefore constitutes a prohibited "demonstration" would violate the Free Exercise Clause of the First Amendment, the Religious Freedom Restoration Act (RFRA), and the Free Speech Clause of the First Amendment. Because Memorial Day 2024 was fast approaching, counsel asked Ranger Scott to provide notice by no later than Friday, May 17, 2024, whether he intended to grant permission for the Knights to hold their annual Memorial Day mass in Poplar Grove National Cemetery.

---

[6] A true and accurate copy of this letter is attached here as Exhibit 6.

49.     On Thursday, May 16, 2024, Ranger Scott sent Mr. Tetreault a letter and permit,[7] doubling down on his position that any non-commital "religious service" is a prohibited "demonstration" that cannot be held in a National Cemetery:

> Attached for your review is a permit for which allows for the set-up of tents, tables, chairs, the use of a blue tooth speaker for your religious service on May 27, 2024, from 9:00 a.m. until 12:00 p.m. The permitted location is directly outside of the cemetery within proximity to the gravesites and is delineated on the map attached to the permit. This location is offered as a reasonable alternative to your requested location inside the cemetery as 36 CFR §12.4 prohibits demonstrations within the National Cemetery. NPS Policy Memorandum 22-01 clarifies this prohibition.

50.     The following day, on Friday, May 17, 2024, undersigned counsel received a letter from Teresa Garrity, Acting Regional Solicitor, responding to the May 13 letter.[8] The letter argues that the Knights' annual Memorial Day mass is a "religious service" that qualifies as a "demonstration" under NPS regulations and Policy Memorandum 22-01, and that, under Policy Memorandum 22-01, "[d]emonstrations within a national cemetery are prohibited 'without exception.'" The letter also argues that refusing permission for the Knights to hold their annual Memorial Day mass inside the National Cemetery is consistent with the First Amendment and RFRA.

51.     The letter also disclosed that, upon learning about the Andersonville mass from the May 13 letter, NPS had taken immediate steps to revoke permission for that mass to be held inside the National Cemetery:

> You also note that KofC is also conducting a Mass inside the Andersonville National Cemetery in Georgia this year, arguing this was authorized after PM 22-01 took effect. NPS has indicated that upon learning of that event being authorized inside the Andersonville National Cemetery in contravention of federal regulation and NPS policy, it is altering that permit to reflect that the KofC religious service may be held outside the cemetery boundary.

---

[7] True and accurate copies of this letter and permit are attached here as Exhibits 7 and 8.
[8] A true and accurate copy of this letter is attached here as Exhibit 9.

(Citation omitted).

\*        \*        \*

52.     The Knights intend to continue holding their annual Memorial Day mass in the Poplar Grove National Cemetery, as they have done for generations, and will continue to apply annually for a permit to do so in 2025 and subsequent years.

## RELEVANT LAW

I.      **Allowing the Knights to Hold Their Annual Memorial Day Mass in the National Cemetery Is Consistent with NPS Policy and Established Practice; Denying That Permission Is a Violation of the Administrative Procedure Act.**

53.     There is no reason under NPS regulations or Policy Memorandum 22-01 to deny the Knights permission to hold their annual Memorial Day mass in the Poplar Grove National Cemetery—or to host similar events in other National Cemeteries.

54.     To begin, there is no reason to think that the Knights' annual mass is "reasonably likely to attract a crowd or onlookers" (so as to meet the regulatory definition of a "demonstration," 36 C.F.R. § 12.3) because in the decades-long history of the Memorial Day mass, it has never drawn a crowd or onlookers.

55.     The May 17 letter from Acting Regional Solicitor Garrity suggests that the participants themselves may constitute the "crowd" contemplated by § 12.3. *See* Ex. 9 at 3. But neither the regulations nor Policy Memorandum 22-01 say that, and that is not a reasonable way to interpret § 12.3. The clear purpose of the "crowd or onlookers" clause is to limit the definition of "demonstration" to events that are likely to attract *non-participants* to gather and interact. The letter's *ipse dixit* assertion that this is "reasonably foreseeable" fails to engage with the generations-long history of the event, which has never been anything but solemn and reverent.

56.     Even if the Memorial Day mass were considered a "demonstration," NPS's regulations specifically contemplate the approval of "demonstrations" as commemorative events

14

held in National Cemeteries on Memorial Day, particular where the occasion has "special historic and commemorative significance to a particular national cemetery." 36 C.F.R. § 12.4.

57.     The May 17 letter from Acting Regional Solicitor Garrity argues that, under Policy Memorandum 22-01, a "demonstration" (as opposed to a "special event") can never be allowed, even as an historically significant commemorative event, and that "the special event must be 'official,' which means that it must be sponsored or co-sponsored by the NPS." Ex. 9 at 5 (citing Policy Memorandum 22-01 at 4). But those arguments are completely circular. The only thing that would prevent NPS from characterizing the Knights' annual Memorial Day mass as a special event is that "special event" is defined as an activity "that is not a demonstration." 36 C.F.R. § 12.3. And, as the unfortunate Andersonville episode illustrates, there is nothing that prevents NPS from co-sponsoring the Knights' annual Memorial Day mass as a "special event," as it previously did for the Knights in Georgia. (In 2023, Ranger Scott had similarly granted a permit for the Knights to hold their annual Memorial Day mass inside the cemetery as a "special event," before he revoked that permission.)

58.     NPS's position is not just substantively wrong; it is also *procedurally* wrong.

59.     Defendants' decision to refuse permission for the Knights to hold their annual Memorial Day mass in the National Cemetery is "final agency action" subject to review under the Administrative Procedure Act. *See Sackett v. E.P.A.*, 566 U.S. 120, 126 (2012) ("*Sackett I*") (explaining that the "hallmarks of APA finality" include that an agency action "determined rights or obligations," that "legal consequences flow from it," and that it marks "the consummation of the Agency's decisionmaking process") (cleaned up).

60.     Among other things, "[t]o comply with the APA, [an] agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection

15

between the facts found and the choice made. Agency action is arbitrary and capricious when the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Roe v. Dep't of Defense*, 947 F.3d 207, 220 (4th Cir. 2020) (quotations omitted).

61.     The NPS policy of prohibiting any religious service in a National Cemetery, other than a commital service, as well as Defendants' application of that policy to the Knights here, fails that standard in numerous ways.

62.     NPS has failed to explain why a categorical ban on religious services is necessary, or even appropriate, to maintain a solemn atmosphere. Indeed, it is hard to conjure an image more closely associated with a "solemn" cemetery scene than a priest leading gathered mourners in prayer—which is of course confirmed by the exception in § 12.4 for commital services. But other religious services, like the Knights annual Memorial Day mass, no less contribute to and no more detract from the solemn atmosphere that NPS says it wishes to promote.

63.     In adopting Policy Memorandum 22-01, NPS also completely failed to grapple with the substantial First Amendment (and RFRA) issues that it raises, as this case and NPS's revocation of permission for the Andersonville mass illustrate.

64.     And in applying the regulatory definition of a prohibited "demonstration" to the Knights' annual Memorial Day mass, Defendants contradicted the established historical record which made clear that the event was not likely attract a crowd or onlookers because, for generations, it never has.

II.    **Refusing the Knights Permission to Hold Their Event in the National Cemetery Based on Their Intention to Celebrate a Religious Sacrament Violates the Free Exercise Clause of the First Amendment.**

65.    Whatever the regulations and NPS's policy say, it violates the First Amendment of the U.S. Constitution to discriminate against and censor the Knights' activities "solely because of their religious character." *Carson as next friend of O. C. v. Makin*, 596 U.S. 767, 780 (2022) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017)).

66.    It is a firmly established constitutional principle that the "[g]overnment fails to act neutrally when it . . . restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). Similarly, a "formal system of entirely discretionary exceptions" or a "formal mechanism for granting exceptions" renders government action or policy "not generally applicable." *Id.* at 536, 537. "A [policy] is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Id.* at 533 (quoting *Emp. Div., Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990)). Further, a policy is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534.

67.    Because NPS's rules specifically characterize activities as prohibited "demonstrations" if they involve a "religious service" (assuming NPS' interpretation is correct), allow entirely discretionary exceptions, consider the particular reasons for permit applicants conduct and have a formal mechanism for granting exceptions, and permit comparable secular conduct, they "do not meet the requirement of being neutral and generally applicable." *Id.* at 533.

68.    Those policies necessarily "impose[] a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Trinity Lutheran*, 582 U.S. at 462 (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)).

17

69. NPS policy, both on its face and as applied to the Knights' annual Memorial Day mass, cannot possibly satisfy that exacting "strict scrutiny" standard, which requires that the policy and its application to the Knights be "justified by a compelling state interest and . . . narrowly tailored in pursuit of that interest." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (citing *Lukumi*, 508 U.S. at 546).

70. Here, the NPS policy cites "a substantial government interest in maintaining a protected atmosphere in national cemeteries where individuals can quietly contemplate and reflect upon the significance of the contributions made to the Nation by those interred." Policy Memorandum 22-01 (citing NPS, *National Cemetery Regulations*, 51 Fed. Reg. 8976, 8877 (Mar. 14, 1986)).

71. Even if a substantial interest were adequate to meet strict scrutiny, a scheme that prohibits the Knights from hosting their annual Memorial Day mass is not narrowly tailored to further that interest.

72. Indeed, the mass is entirely *consistent* with the goal of promoting quiet and reverent contemplation.

73. There is certainly no substantial difference between the Knights' Memorial Day service and a graveside committal service, which is permitted under the policy and regulations. *See* Policy Memorandum 22-01, at 5; 36 C.F.R. § 12.4.

74. In any event, the policy "'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'" *Kennedy*, 597 U.S. at 526 (quoting *Fulton*, 593 U.S. at 533).

75. Committal services are one example of this. As another, it would be consistent with the policy to allow a *reenactment* of the annual Memorial Day mass held at Poplar Grove National

Cemetery for generations based on its historical significance as a commemorative event, *see* 36 C.F.R. § 12.3 (defining "special event" to include a "reenactment"); but to *conduct* the mass itself is a prohibited "demonstration" because it constitutes a "religious service," *id*.

76.     That absurd result does not satisfy the constitutional demands of strict scrutiny.

**III.  Refusing the Knights Permission to Hold Their Event in the National Cemetery Also Violates the Religious Freedom Restoration Act by Substantially Burdening the Knights' Free Exercise of Religion Without Being the Least Restrictive Means to Serve a Compelling Governmental Interest.**

77.     As a federal agency, NPS is bound by the Religious Freedom Restoration Act (RFRA), see 42 U.S.C. § 2000bb *et seq*.

78.     RFRA "operates as a kind of super statute, displacing the normal operation of other federal laws." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020).

79.     It imposes a strict-scrutiny standard on governmental actions that "substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1(a).

80.     RFRA requires the government to "demonstrate[] that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 705 (2014) (emphasis omitted) (quoting 42 U.S.C. §§ 2000bb–1(a), (b)).

81.     Notably, under RFRA the strict scrutiny standard applies "even if the burden results from a rule of general applicability." 42 U.S.C. §§ 2000bb–1(a).

82.     Even if NPS policy did not specifically prohibit a "religious service," the denial of a permit for the Knights to host their annual Memorial Day mass would still constitute a substantial burden on their religious exercise prohibited under RFRA.

83.     It is the Knights' sincere religious belief that they need to be within the cemetery for their Memorial Day mass and service, as memorialized in their resolution.

84.     Holding a service outside the cemetery walls, down the hill, and out of sight of the vast majority of the gravesites simply does not provide a meaningful substitute that accords with their religious beliefs.

85.     Prohibiting the Knights from holding the service within the cemetery substantially burdens their religious practice and cannot satisfy strict scrutiny, as explained above.

86.     Even if the interest expressed in the policy were found compelling, "[t]he least-restrictive-means standard is exceptionally demanding . . . and it is not satisfied here." *Burwell*, 573 U.S. at 728.

87.     NPS does not "lack[] other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the [Knights]." *Id*.

88.     The Knights, therefore, are "entitled to an exemption from the rule" under RFRA. *Id.* at 695.

**IV.     Refusing the Knights Permission to Hold Their Event in the National Cemetery Based on Their Intention to Hold a Religious Service Also Represents Content-Based and Viewpoint Discrimination Which Violates the Free Speech Clause of the First Amendment.**

89.     The Supreme Court has recognized that restrictions on religious expression often violate the Free Speech Clause of the First Amendment, as well. *See, e.g., Kennedy*, 597 U.S. at 543 (holding that the post-game prayers of a high school football coach were "doubly protected by the Free Exercise and Free Speech Clauses of the First Amendment").

90.     "Indeed, in Anglo–American history, at least, government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without

religion would be Hamlet without the prince." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) (emphasis in original).

91.    The Court, therefore, "ha[s] not excluded from free-speech protections . . . acts of worship." *Id*. This is a case in point.

92.    The Knights wish to gather at the Poplar Grove National Cemetery on Memorial Day in the sight of God, as they have done for generations, to celebrate the mass and honor and pray for our Nation's fallen soldiers.

93.    If they were there for a secular purpose, it is doubtful that NPS would characterize their mass as a prohibited "demonstration" in the first place.

94.    But due to the religious content of their observance, they are shut out.

95.    The Free Speech Clause of the First Amendment does not countenance that result any more than the Free Exercise Clause does.

96.    Under the Free Speech Clause, "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995).

97.    Thus, "[w]hen a government does not speak for itself, it may not exclude speech based on religious viewpoint; doing so constitutes impermissible viewpoint discrimination." *Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 258 (2022) (quotations omitted) (quoting *Good News Club v. Milford Central School*, 533 U.S. 98, 112 (2001)).

98.    "Discrimination against speech because of its [religious] message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828 (emphasis added).

99.    The NPS's prohibition on allowing the Knights within the cemetery for their Memorial Day mass due to its religious nature is not merely unlawful content-based discrimination

on speech—it is textbook viewpoint discrimination, which is per se unconstitutional. *See id.* at 828-29.

*　　*　　*

100.     Defendants' actions have caused, and will continue to cause, the Knights to suffer undue and actual hardship and irreparable injury. The Knights do not have an adequate remedy at law. As a direct an proximate result of Defendants' actions, the Knights have suffered and will continue to suffer irreparable harm, including the loss of their constitutional rights. And absent declaratory and injunctive relief, the Knights will continue to be harmed.

**CLAIMS FOR RELIEF**

**Count I**
***Agency Action Unlawfully Withheld or Unreasonably Delayed***
**(5 U.S.C. §§ 702, 706(1) – Administrative Procedure Act)**
**against NPS, Interior, and Ranger Scott and Superintendent Viets in Their Official Capacities**

101.     The Administrative Procedure Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

102.     The APA defines "agency action" to include "the whole or a part of any agency rule, order, license, sanction, relief, or the equivalent *or denial thereof, or failure to act*." 5 U.S.C. §§ 551(13), 701(2) (emphasis added).

103.     The APA further provides that, when an action is brought, "[t]he reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

104.     For the foregoing reasons, Defendants unlawfully and unreasonably withheld a permit from the Knights that would allow them to hold their annual Memorial Day mass in the Poplar Grove National Cemetery.

22

105.    The Court should therefore enter an order compelling Defendants to issue a permit to the Knights that would allow them to hold their annual Memorial Day mass in the Poplar Grove National Cemetery.

**Count II**
*Arbitrary and Capricious Agency Action*
**(5 U.S.C. §§ 702, 706(2)(A) – Administrative Procedure Act)**
**against NPS, Interior, and Ranger Scott and Superintendent Viets in Their Official Capacities**

106.    The APA provides that, when an action is brought to challenge an agency action, including the denial of a permit or the failure to act on an application, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

107.    "To comply with the APA, [an] agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. Agency action is arbitrary and capricious when the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Roe v. Dep't of Defense*, 947 F.3d 207, 220 (4th Cir. 2020) (quotations omitted).

108.    The decision not to allow the Knights to hold their annual Memorial Day mass in the National Cemetery was arbitrary and capricious. Defendants have failed to provide a reasonable explanation for treating the Memorial Day mass as a "demonstration," even though the event's long history demonstrates that it is not "reasonably likely to attract a crowd or onlookers." 36 C.F.R. § 12.3. They have further failed to provide a reasonable explanation for not approving the Memorial Day mass as an historically significant commemorative event, which is specifically

23

contemplated under NPS regulations. *See* 36 C.F.R. § 12.4. And they have failed to provide a reasonable explanation for denying the Knights' permit application at Poplar Grove when NPS is not only permitting but advertising a similar mass at Andersonville.

109.    The Court should therefore hold unlawful and set aside the decision not to allow the Knights to hold their annual Memorial Day mass in the National Cemetery and grant such other relief as is necessary and appropriate to allow the Knights to proceed with the event.

### Count III
### *Agency Action Contrary to Constitutional Right*
### (5 U.S.C. §§ 702, 706(2)(B) – Administrative Procedure Act)
### against NPS, Interior, and Ranger Scott and Superintendent Viets in Their Official Capacities

110.    The APA provides that, when an action is brought to challenge an agency action, including the denial of a permit or the failure to act on an application, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

111.    For the foregoing reasons, decision not to allow the Knights to hold their annual Memorial Day mass in the National Cemetery is contrary to constitutional right under both the Free Exercise Clause and the Free Speech Clause of the U.S. Constitution.

112.    The Court should therefore hold unlawful and set aside the decision not to allow the Knights to hold their annual Memorial Day mass in the National Cemetery and grant such other relief as is necessary and appropriate to allow the Knights to proceed with the event.

### Count IV
### *Agency Action Short of Statutory Right*
### (5 U.S.C. §§ 702, 706(2)(C) – Administrative Procedure Act)
### against NPS, Interior, and Ranger Scott and Superintendent Viets in Their Official Capacities

113.    The APA provides that, when an action is brought to challenge an agency action, including the denial of a permit or the failure to act on an application, "[t]he reviewing court shall

. . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

114.    RFRA provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b). It further provides that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." *Id.* § 2000bb-1(c)

115.    For the foregoing reasons, the decision not to allow the Knights to hold their annual Memorial Day mass in the National Cemetery exceeds Defendants' statutory authority and falls short of the Knights' statutory rights under RFRA.

116.    The Court should therefore hold unlawful and set aside the decision not to allow the Knights to hold their annual Memorial Day mass in the National Cemetery and grant such other relief as is necessary and appropriate to allow the Knights to proceed with the event.

## Count V
### *Agency Action Unsupported by Substantial Evidence or Unwarranted by the Facts*
**(5 U.S.C. §§ 702, 706(2)(E)–(F) – Administrative Procedure Act)**
**against NPS, Interior, and Ranger Scott and Superintendent Viets in Their Official Capacities**

117.    The APA provides that, when an action is brought to challenge an agency action, including the denial of a permit or the failure to act on an application, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or . . . unwarranted by

the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706(2)(E)–(F).

118.   For the foregoing reasons, the denial of the Knights' permit application is unsupported by substantial evidence and unwarranted by the facts. In particular, there is no reasonable factual basis to conclude that the Memorial Day mass is likely to attract a crowd or onlookers, *see* 36 C.F.R. § 12.3, nor to conclude that it should not be considered an historically significant commemorative event, *see id.* § 12.4.

119.   The Court should therefore hold unlawful and set aside the decision not to allow the Knights to hold their annual Memorial Day mass in the National Cemetery and grant such other relief as is necessary and appropriate to allow the Knights to proceed with the event.

<u>**Count VI**</u>
***Violation of the Free Exercise Clause***
**(U.S. CONST., amend. I)**
**against NPS, Interior, and Ranger Scott and Superintendent Viets in Their Official**
**Capacities**

120.   It is well established that citizens may "seek[] equitable relief against federal officials in their official capacities" where they "alleg[e] that those officials exceeded the scope of their authority and/or acted unconstitutionally." *Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022) (citing *Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958); *Noble v. Union River Logging R.R. Co.*, 147 U.S. 165, 171–72 (1893).

121.   For the foregoing reasons, the NPS policy of treating a "religious service" in a National Cemetery as a prohibited "demonstration" unlawfully burdens the Knights' religious exercise and violates the Free Exercise Clause of the First Amendment, both on its face and as applied.

122.    For the foregoing reasons, the denial of permission for the Knights to hold their annual Memorial Day mass inside the National Cemetery unlawfully burdens the Knights' religious exercise and violates the Free Exercise Clause of the First Amendment.

123.    The NPS regulations and policy, both on their face and as applied, are not neutral or generally applicable.

124.    The NPS regulations and policy, both on their face and as applied, are not narrowly tailored to further a compelling government interest.

125.    The Court should therefore enjoin Defendants from applying or enforcing this unconstitutional policy and grant such other relief as is necessary and appropriate to allow the Knights to proceed with the event.

### Count VII
*Violation of the Religious Freedom Restoration Act*
**(42 U.S.C. § 2000bb *et seq.*)**
**against NPS, Interior, and Ranger Scott and Superintendent Viets in Their Official & Personal Capacities**

126.    RFRA provides a cause of action by which "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb *et seq.*

127.    When RFRA is violated, "[a] person whose exercise of religion has been unlawfully burdened. . . can sue Government officials in their personal capacities" for monetary damages, in addition to seeking other appropriate relief. *Tanzin v. Tanvir*, 592 U.S. 43, 46–47 (2020) (emphasis added).

128.    For the foregoing reasons, the NPS policy of treating a "religious service" in a National Cemetery as a prohibited "demonstration" imposes a substantial burden on the Knights' religious exercise, both on its face and as applied.

129.    For the foregoing reasons, the denial of permission for the Knights to hold their annual Memorial Day mass inside the National Cemetery imposes a substantial burden on the Knights' religious exercise, both on its face and as applied.

130.    The NPS regulations and policy, both on their face and as applied, violate RFRA.

131.    The Court should therefore award the Knights monetary damages against Chief Ranger Scott and Superintendent Viets in their individual capacities, enjoin Defendants from applying or enforcing the unconstitutional NPS policy, and grant such other relief as is necessary and appropriate to allow the Knights to proceed with the event.

### Count VIII
*Violation of the Free Speech Clause*
**(U.S. CONST., amend. I)**
**against NPS, Interior, and Ranger Scott and Superintendent Viets in Their Official Capacities**

132.    The Knights may seek equitable relief against Defendants to remedy unconstitutional action. *See Strickland*, 32 F.4th at 363.

133.    For the foregoing reasons, the NPS regulations and policy, on their face and as applied, and the prohibition of the Knights' annual Memorial Day mass within the National Cemetery due to its religious nature constitutes both content-based discrimination and viewpoint discrimination and is *per se* unconstitutional.

134.    The NPS regulations and policy, both on their face and as applied, and the prohibition of the Knights' annual Memorial Day mass within the National Cemetery due to its religious nature are not justified by a compelling governmental interest or any other adequate or permitted government interest, and are not narrowly tailored or the least-restrictive means to achieve that interest.

135.   The Court should therefore enjoin Defendants from applying or enforcing this unconstitutional policy and grant such other relief as is necessary and appropriate to allow the Knights to proceed with the event.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays that this Court:

a.   Enter an order compelling Defendants to issue a permit to the Knights that would allow them to hold their annual Memorial Day mass in the Poplar Grove National Cemetery;

b.   Declare that Defendants' regulations and policies, as described herein, violate the Knights' rights under the U.S. Constitution and federal law;

c.   Hold unlawful and set aside Defendants' decisions not to allow the Knights to hold their annual Memorial Day mass in the Poplar Grove National Cemetery;

d.   Hold unlawful and set aside Policy Memorandum 22-01;

e.   Preliminarily and permanently enjoin Defendants from applying or enforcing Policy Memorandum 22-01 or any other policy to prohibit religious service in a National Cemetery or other federal land managed by the National Park Service;

f.   Hold unlawful and set aside the denial of the Knights' permit application and grant such other relief as is necessary and appropriate to allow the Knights to proceed with the event;

g.   Award the Knights nominal and monetary damages against Chief Ranger Scott and Superintendent Viets in their individual capacities, *see Tanzin v. Tanvir*, 592 U.S. 43 (2020), for violation of the Knights' rights under the Religious Freedom Restoration Act;

h.   Award Plaintiff costs and attorney's fees incurred in this action; and

i.   Grant such other relief as the Court may deem just and proper.

Dated: May 20, 2024

Respectfully submitted,

KNIGHTS OF COLUMBUS,
COUNCIL 694
*By Counsel*

/s/ John S. Moran
John S. Moran (VA Bar #84236)
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
Phone: (202) 828-2817
Fax: (202) 828-3327
*jmoran@mcguirewoods.com*

Roger Byron*
FIRST LIBERTY INSTITUTE
2001 W. Plano Pky., Suite 1600
Plano, TX 75075
Phone: (972) 941-4444
Fax: (972) 941-4457
*rbyron@firstliberty.org*

\*    Application for admission *pro hac vice*
    forthcoming