**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

KNIGHTS OF COLUMBUS, COUNCIL 694,                )
                                                 )
                            Plaintiff,            )
            v.                                    )         No. 3:24-cv-363-JAG
                                                 )
NATIONAL PARK SERVICE, *et al.,*                 )
                                                 )
                            Defendants.           )
_____  )

**<u>DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION</u>**

JESSICA D. ABER
United States Attorney

YURI S. FUCHS
MATTHEW J. MEZGER
Assistant United States Attorneys
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:     (703) 299-3872/3741
Fax:    (703) 299-3983
Email:  yuri.fuchs@usdoj.gov
          matthew.mezger@usdoj.gov

*Counsel for Defendants*

## INTRODUCTION

Plaintiff Knights of Columbus, Council 694 ("KOC") holds a yearly Memorial Day Mass. While professing that it has historically held this Mass at Poplar Grove National Cemetery, (hereinafter "the Cemetery"), KOC has also held this Mass in its Council Home, proposed holding it in different cemeteries altogether, and for the last two years has been permitted to hold this mass just outside of the grave site area at the Cemetery. KOC now seeks an extraordinary affirmative injunction allowing KOC to hold its Mass in front of grave sites on Memorial Day 2024 and enjoin the National Park Service ("NPS") from applying religiously and viewpoint neutral regulations aimed at maintaining the atmosphere of solemn tranquility at the Cemetery. KOC's arguments in its Motion for a Temporary Restraining Order and Preliminary Injunction and its accompanying Memorandum are unavailing, and KOC is not entitled to either a temporary restraining order or preliminary injunction. *See* ECF No. 8 (hereinafter "Motion"); *see also* ECF No. 9 ("Memorandum" or "Mem.").

First, KOC cannot show a likelihood of success on the merits of its claims. KOC does not show a likelihood of success under the Free Exercise Clause of the First Amendment as the application of generally applicable NPS regulations and policy neither coerces or burdens its beliefs nor constitutes a specific targeting of KOC's religious beliefs. Likewise, KOC's claim under the Religious Freedom Restoration Act ("RFRA") is not likely to succeed. KOC's religious beliefs are not substantially burdened and NPS has a compelling interest in maintaining the solemnity of the Cemetery—particularly where KOC seeks to hold a 45-person gathering with a Bluetooth speaker at a tent on Memorial Day within an area that all visitors to the Cemetery must traverse. Indeed, while KOC reflexively asserts that its religious beliefs are burdened, it offers no specifics of why its religious beliefs compel it to hold a Memorial Day Mass in a specific location in the Cemetery and why an alternative adjacent location within the Cemetery's grounds cannot comport with its beliefs—particularly where KOC has held its Mass outside of cemetery grounds. And KOC makes only cursory arguments that

its inability to hold the specific Mass it desires violates the Free Speech Clause of the First Amendment and is unlawful agency action under the Administrative Procedure Act ("APA"). It is neither.

Second, KOC cannot show irreparable harm. KOC's prior conduct in holding its Mass elsewhere highlights that the harm in not being able to hold a Memorial Day Mass near the grave sites at the Cemetery is not irreparable. Moreover, the availability of alternative forms of worship available to KOC, including being permitted to hold its ceremony at an alternative location at the Cemetery highlight that its harm is anything other than irreparable.

Finally, KOC cannot show that the public interest and equities support the issuance of a mandatory injunction altering the status quo. NPS has a well-recognized interest in the maintenance of the national cemeteries under its care, and the Fourth Circuit itself has recognized its interest in ensuring the tranquility and solemnity of national cemeteries. By seeking an affirmative injunction to alter NPS's application of its neutral regulations in the Cemetery, KOC's sought injunction is not in the public interest.

For all these reasons, Defendants respectfully request that the Court deny KOC's Motion.

## FACTUAL BACKGROUND

i.   *KOC and The Cemetery.*

Plaintiff Knights of Columbus, Council 694, is a local council of the Knights of Columbus, a Catholic fraternal service order, headquartered in Petersburg, Virginia. ECF No. ¶ 6 ("Compl."). According to its materials, KOC holds an annual Memorial Day Mass in the Cemetery in accordance with its religious beliefs.[1] The Cemetery is an inactive national cemetery located near Petersburg,

---

[1] KOC does not explain further why its religious beliefs require that a Mass be held in the Cemetery specifically. At best, KOC appends a resolution that it adopted *in 2024*, which asserts "that holding [its] religious memorial service in the national cemetery aids and helps [it] pray for the fallen, and that failure to hold the service in the national cemetery would diminish [its] ability to pray for the fallen." ECF No. 1-4. KOC's resolution, however, provides no explanation of why it is inconsistent with its sincerely held religious beliefs to hold its Mass elsewhere on the grounds of the Cemetery.

Virginia where some 6,000 U.S. soldiers are buried, including individuals who lost their lives in the United States Civil War, the Spanish American War, World War I, World War II, and the Korean War. *See* Poplar Grove National Cemetery, National Park Service (last updated Feb. 7, 2024), https://www.nps.gov/places/poplar-grove-national-cemetery.htm. Since 1933, the Cemetery has been under the administration of the National Park Service ("NPS"). *Id.*

KOC alleges that "[m]ost years, the mass has been celebrated in a gazebo with participants on a grass lawn, adjacent to the gravesites" located at the Cemetery. Compl. ¶ 23. However, KOC itself notes that it has held its Mass in alternative locations. Within the Cemetery itself, KOC acknowledges that it was once asked to relocate to hold its Mass elsewhere. *Id.* ¶¶ 23-24. KOC also acknowledged that it held services outside of the Cemetery while it was under renovation for several years. ECF No. 1-10 at 5; *see also* Mem. at 12. Furthermore, in 2016, KOC planned to hold its memorial Mass at the Blandford Cemetery Bandstand before ultimately holding its service at its Council Home.[2] And in 2023, KOC decided not to hold its service at the cemetery due to weather related concerns and instead held its service at its Council Home, which is not on the premises of the Cemetery. *See* ECF No. 1-10 at 3; *see also* Compl. ¶ 39. To NPS's knowledge, KOC is the only group that has ever been permitted to conduct a demonstration or special event at the Cemetery. EX. 1 ¶ 20.

    *ii.*    *KOC's 2023 Permit to Hold Its Mass in the Cemetery.*

As relevant to the instant lawsuit, KOC submitted to NPS an application for a permit to hold a Mass near the grave sites at the Cemetery on April 27, 2023 and sought to hold its Mass on Memorial Day 2023. ECF No. 1-2 at 9-12. A permit for KOC's Mass was then approved on May 15, 2023. ECF No. 1-2 at 8. After further follow-up, on May 17, 2023, Chief Ranger Scott e-mailed KOC Treasurer Tetreault, informing him that there was a "Directors Order concerning National Cemeteries that is

---

[2] The Blandford Cemetery is administered by the Commonwealth of Virginia rather than the NPS. *See* Blandford Cemetery, City of Petersburg (last accessed May 21, 2024), https://www.petersburgva.gov/303/Blandford-Cemetery.

applicable to this situation," and then noting that KOC's request to hold its Mass at its previous site in the Cemetery was not permissible. ECF No. 1-2 at 4-5. As Mr. Scott explained, special events or demonstrations were prohibited at national cemeteries on Memorial Day apart from official commemorative events as per NPS Policy Memorandum 22-01. *Id.* at 5; *see also* ECF No. 1-3. However, Mr. Scott also noted that a NPS superintendent could consider whether a demonstration could occur outside of a national cemetery in a designated First Amendment area and offer that as an alternative. ECF No. 1-2 at 5. Accordingly, Mr. Scott provided KOC with a new permit designating a special "first amendment area" at the Cemetery where KOC could hold its Mass. *Id.* at 4-5. KOC subsequently executed the permit that would allow it to hold a Mass at the First Amendment area in the Cemetery, *id.* at 1-3, but nonetheless chose to hold its service at its Council Home. ECF No. 1-10 at 3; ECF No. 9-1 ¶ 52.

  iii.  *KOC's 2024 Permit to Hold Its Mass in the Cemetery.*

   On March 8, 2024, Mr. Tetreault submitted a request for KOC to hold its Memorial Day Mass at the Cemetery. ECF No. 1-6 at 3-4. In describing the proposed activity, KOC's application noted that it was requesting a permit for an "annual Memorial Day memorial service in the Cemetery on Monday, May 27, 2024" whereby "[t]enting and chairs for the service w[ould] be set up on the asphalt area by the building just inside the cemetery walls." ECF No. 1-5 at 2. KOC's completed application noted that its event would last from 9:00 AM to 12:00 PM and would involve 45 participants and need parking for 15 cars. *Id.* KOC's application noted that it would need three tables, 50 chairs, a tent, and Bluetooth speaker as support equipment. *Id.* Mr. Scott responded to the e-mail submitting the request on May 2, 2024, noting that an official event was scheduled at the same location proposed by KOC and that, as NPS had in 2023, it could offer KOC a permit for its Mass on "the large grass area adjacent to the parking lot at Poplar Grove to conduct [its] activity." *Id.* Mr. Scott further noted that because of the existing event at the Cemetery, KOC's "event and clean-up . . . would have to be completed by

noon [on Memorial Day] to avoid conflict with the other scheduled activity." *Id.* The event referenced by Mr. Scott is an official commemorative event for Memorial Day being held at the Special Use Area of the Cemetery where high attendance is expected and the ceremony will include, *inter alia,* commemorative reading and the decorating of graves at the Cemetery. EX. 1 ¶ 9.

On May 9, 2024, Mr. Tetreault responded to Mr. Scott's e-mail and claimed that it was important to KOC to have its event "inside the cemetery itself, not outside the cemetery somewhere" while claiming that KOC "always had it there every year since at least the 1960s or before." ECF No. 1-5 at 2. On Monday, May 13, 2024, counsel for KOC sent a letter to the NPS requesting that it grant KOC's request to conduct its Memorial Day Mass within the walls of the Cemetery, threatening litigation, and requesting a response to the letter by May 17, 2024. ECF No. 1-7. On May 16, 2024, Mr. Scott wrote to Mr. Tetreault of KOC and attached a permit that allowed KOC's "religious service on May 27, 2024 from 9:00 a.m. until 12:00 p.m." ECF No. 1-8. That same letter noted that the permitted location was "directly outside of the cemetery within proximity to the gravesites" and "offered as a reasonable alternative to [KOC's] requested location inside the cemetery as 36 CFR § 12.4 prohibits demonstrations within the National Cemetery." *Id.* The permit attached to the letter included a map on which the area permitted was shown as a red box to the left of the cemetery wall, showing a designated area still on NPS property but not within the Cemetery proper. ECF No. 1-9 at 6; *see also* EX. 1 ¶ 11, 18.

As the Superintendent for the Petersburg National Battlefield has attested, KOC's desired location for its permit was not granted because KOC's activity was determined to be a "demonstration" in light of governing "NPS regulations and policy emphasizing the importance of maintaining the atmosphere of solemn tranquility at the Cemetery." EX. 1 ¶¶ 17-18. Specifically, the Superintendent found that KOC's description of the event fit within NPS's definition of a demonstration under its own regulations and guidance as KOC itself noted it needed a Bluetooth

speaker to amplify sound as well as other equipment and anticipated a number of cars that exceeded available parking. *Id.* ¶ 17. Furthermore, KOC's desired location was in a location whereby any visitor to the Cemetery would have to pass in entering the Cemetery, thus making it foreseeable that KOC's activity would attract onlookers. *Id.* ¶ 18.

NPS subsequently responded to the letter submitted by KOC's counsel on May 17, 2024, explaining the basis for its determination that KOC's service constituted a "demonstration" that would not be permitted within the grounds of the Cemetery by regulation and explaining the rationale echoed by the Superintendent. ECF No. 1-10 at 2-3. NPS then further explained that its decision was consistent with respect to a similar request made by another KOC chapter to hold a Memorial Day Mass inside the Andersonville National Cemetery in Georgia. *Id.* As with NPS's decision for the Cemetery, NPS would only offer a permit for that separate KOC chapter to hold a religious service outside of the cemetery boundary at Andersonville National Cemetery. *Id.*; *see also* EX. 2 ¶¶ 11, 13.[3]

## REGULATORY BACKGROUND

The Cemetery is one of 14 national cemeteries managed by NPS. "National Cemetery Regulations," 51 Fed. Reg. 8976, 8976 (Mar. 14, 1986). In 1986, following an agreement with the Department of Veterans Affairs that NPS would manage and operate these 14 cemeteries, NPS issued regulations regarding the maintenance and operation of the cemeteries. *Id.* at 8976. As that regulation sets out: "National cemeteries are established as national shrines in tribute to the gallant dead who have served in the Armed Forces of the United States." 36 C.F.R. § 12.2. To further the goal of maintaining the solemn commemorative and historical character of these areas, NPS prohibits "demonstrations" and "special events" within the confines of a national cemetery. 36 C.F.R. § 12.4;. Read in full, NPS regulations establish that:

Conducting a special event or demonstration, whether spontaneous or organized, is prohibited

---

[3] Defendants understand that the Georgia KOC chapter will hold its Memorial Day Mass at a church rather than at Andersonville National Cemetery. *See* EX. 2 ¶ 16.

> except for official commemorative events conducted for Memorial Day, Veterans Day and other dates designated by the superintendent as having special historic and commemorative significance to a particular national cemetery. Committal services are excluded from this restriction.

*Id.* § 12.4. The current regulations define "demonstration" as "picketing, speechmaking, marching, holding a vigil or religious service, or any other like form of conduct that involves the communication or expression of views or grievances, engaged in by one or more persons, the conduct of which is reasonably likely to attract a crowd or onlookers." *Id.* § 12.3. A "special event" under the regulation is similarly defined, but unlike "a demonstration" is reserved to conduct that does not have any type of expressive message (e.g., "sports event, pageant, celebration, historical reenactment, entertainment, exhibition, parade, fair, festival, or similar activity"). *Id.* Combined, these restrictions "prohibiting special events and demonstrations within national cemeteries reflects the substantial government interest that exists in maintaining this protected atmosphere where individuals can quietly contemplated and reflect upon the significance of the contributions made to the nation by those interred." 51 Fed. Reg. at 8977.

Since their promulgation, NPS amended the regulations in 2014 to clarify, *inter alia*, the definition of "demonstration." EX. 3 ¶ 5. In general, the 2014 amendments eliminated the previous requirement that two or more individuals have the "intent to . . . to attract a crowd or onlookers." *Compare* 51 Fed Reg. at 8979, *with* 36 C.F.R. § 12.3. These technical amendments also reaffirmed the regulations' original purpose for preserving the tranquil atmosphere and doing so by restricting "special events" and "demonstrations." *See generally* "National Cemeteries, Demonstration, Special Event," 79 Fed. Reg. 33434, 33434-35 (June 11, 2014).

On August 15, 2022, NPS then issued a guidance memorandum directed to all Regional Directors and Superintendents of National Cemeteries regarding the enforcement of these regulatory provisions. *See generally* ECF No. 1-3. The guidance was borne out of concerns that several parks were having in managing activities at national cemeteries and to ensure consistent implementation of NPS's

regulations. EX. 3 ¶ 7. That guidance clarified that activities that qualify as "demonstrations" under the regulation are prohibited "without exception," ECF No. 1-3 at 3, and that activities which qualify as "special events" are permitted in "limited circumstances"—i.e., when the special event is "sponsored or co-sponsored by the NPS," *id.* at 4. To determine whether an activity is a "demonstration" or "special event," the Superintendent of each cemetery performs a two-part analysis: "(1) whether the activity involves communication or expression of views or grievances; and (2) whether the activity is likely to attract a crowd or onlookers." *Id.* at 2. The first analysis, whether the activity is heard or not, turns on whether "communication or expression of views is the primary purpose of the activity." *Id.* at 2-3. The second analysis, without "consider[ing] the content of any communication or expression," turns on whether the activity "is reasonably likely to attract a crowd or onlookers." *Id.* at 3. In making this assessment, "the volume of the communication or expression of views, and whether amplification, signs, props, or other items are being used" may be considered." *Id.* at 3. Further, "a presumption that activity is reasonably likely to attract a crowd or onlookers," for those activities that use "amplification and structures, such as stages." *Id.* at 3. If both showings are met, the activity is a prohibited "demonstration," and if only the second showing is met, the activity qualifies as a "special event." *See id.* at 3, 5.

Though "special events" sponsored or co-sponsored by NPS are permitted, the guidance reminds enforcing officials that the regulations cabin their discretion regarding their ability to add additional dates for commemorative events. *Id.* at 4. Indeed, special events "may only be conducted for Memorial Day, Veterans, Day and other dates designated by the superintendent as having special historical and commemorative significance to a particular national cemetery." *Id.* The reason for such a circumscribed set of events is because that is what NPS has determined as the "maximum extent that this protected atmosphere [national cemeteries] should be disturbed" given that "ample opportunities exist for persons desiring to conduct special events and demonstrations in areas adjacent

to or near the national cemeteries." *Id.* at 2.

Of course, for any activity that is not a permitted "demonstration" or "special event," NPS guidance provides that "the superintendent should evaluate whether the demonstration could occur outside of the national cemetery in a designated First Amendment area, and, if so, offer that as an alternative." *Id.* at 3; *see also id.* at 5 (similar provision for unsponsored "special events").

## ARGUMENT

### Plaintiff Fails to Show that It Satisfies the Four Factors to Justify Injunctive Relief.

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted). To obtain a preliminary injunction, KOC must make a "clear showing" of each of the four factors: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) that the balance of equities tips in their favor; and (4) that the public interest favors the requested equitable relief. *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *see also Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017) (""The standard for granting either a TRO or a preliminary injunction is the same.").

"Ordinarily, preliminary injunctions are issued to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *See Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012). KOC here, however, does not seek a preliminary injunction solely for its generally intended purpose—to maintain the status quo. Instead, KOC seeks the extraordinary and *disfavored* relief of a "mandatory" injunction asking this Court to preclude Defendant from being able to enforce NPS policy already in effect and allow KOC the ability to gather at a part of the Cemetery where the organization has not been permitted to assemble. *See Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994).

To obtain this extraordinary and disfavored relief, courts require "a heightened showing of the

four factors." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1209 (10th Cir. 2009); *Vollette v. Watson*, 2012 WL 3026360, at *3 (E.D. Va. July 24, 2012) (explaining that the *Winter* standard "becomes even more exacting" for mandatory injunctive relief). As shown below, KOC cannot muster a regular showing— let alone a heightened showing—of the four factors required for a preliminary injunction.

### A.   Factor 1: KOC cannot show it is likely to succeed on the merits.

No injunction should issue to KOC because it cannot establish that it has a "clear and convincing probability of success" on the merits on the claims that it brings in its Complaint. *Cornwell v. Sachs*, 99 F. Supp. 2d 695, 704 (E.D. Va. 2000).

### 1.   KOC Is Unlikely to Succeed on Its Free Exercise Claim.

The Free Exercise Clause's protections, *see* U.S. Const. amend. I, "pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babiu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) ("*Lukumi*"). Here, KOC's Free Exercise claim is not likely to succeed because: (1) it has not established a burden on its religion; and (2) assuming there a burden caused by NPS's regulation, it done by a constitutionally permissible neutral and generally applicable regulation.

### a.   NPS's Prohibition of Demonstrations Within the Cemetery Does Not Coerce KOC into Surrendering its Religious Beliefs.

"[R]egardless of the specific nature of the government action at issue, a plaintiff alleging a free exercise claim bears the burden of demonstrating an infringement of his rights under the Free Exercise Clause." *Mahmood v. McKnight*, 2024 WL 2164882 at *7 (4th Cir. May 15, 2024) (cleaned up) (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022)). Should KOC meet this threshold burden, "the focus *then* shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demand of [Supreme Court] case law." *Kennedy*, 597 U.S. at 524 (emphasis added). A plaintiff does not establish a burden where the "incidental effects of government programs, which may make it more difficult to practice certain religions, but which have no tendency to coerce

individuals into acting contrary to their religious beliefs." *Lyng v. Nw. Indian Cemetery Prot. Ass'n*, 485 U.S. 439, 450-451 (1988). Instead, the plaintiff must show either: (1) that it must surrender its religious character or beliefs to participate in the government program; or (2) be compelled to an action, through direct or indirect government coercion, that is inconsistent with its beliefs. *See Mahmood*, 2024 WL 2164882, at *9; *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 466 (2017).

KOC cannot make this showing in this case. NPS is not coercing action from KOC; it is merely conditioning entry to the Cemetery to those persons who are not conducting a "demonstration" or "special event" within the meaning of its regulations. *See Mahmoud*, 2024 WL 2164882, at *10 (affirming the denial of preliminary injunction where statute did not impose a burden because a school district did not require students to change religious views in the teaching of reading material). KOC can (and has) conducted a Memorial Day Mass at other cemeteries and at locations that are not a cemetery at all and did so without renouncing or disavowing its religious beliefs. EX. 4. Thus, not being permitted to conduct a Mass within the Cemetery does not require KOC to renounce or otherwise alter its religious beliefs.

Moreover, the regulation preventing KOC's proposed use of the Cemetery does not operate along religious lines. The regulation is clear: all "demonstrations"—secular *and* religious alike—are categorically prohibited from occurring in the Cemetery. *See* 36 C.F.R. § 12.4. Thus, unless KOC eliminates *both* the communication of any message/views in its requested event and the aspects of its requested event that are likely to draw a crowd or onlookers (*i.e.*, stage, sound system, tent), NPS regulations prohibit such conduct in the Cemetery "without exception." ECF No. 1-3 at 3; *see also See Trinity Lutheran*, 582 U.S. at 462 (holding that Missouri's scrap-tire program was unconstitutional because it disqualified eligible recipients for benefits based solely on their religious nature and required them to "participate in an otherwise available benefit program or remain a religious institution").

The Supreme Court's seminal decision in *Lyng* underscores this conclusion. There, the

Supreme Court addressed a Free Exercise challenge to the federal government's decision to engage in timber harvesting and road construction on a particular tract of federal land. 485 U.S. at 450-451. Native American tribes challenged that decision because the federal land at issue has been used "for a very long time, to conduct a wide variety of specific rituals that aim to accomplish their religious goals," and the federal government's proposed development "could have devasting effects on traditional Indian religious practices." *Id.* at 451.

Even under the assumption that the Native American tribes would be *unable* to practice their faiths if the government's proposed land development came into fruition, *Lyng* held that the proposed development was constitutional because there was no showing that "the affected individuals [would] be coerced by the Government's action into violating their religious beliefs[,] nor would either governmental action penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Id.* at 449; *see also Trinity Lutheran*, 582 U.S. at 460 (reiterating *Lyng*'s coercion analysis); *Mahmoud*, 2024 WL 2164882, at *11 ("Supreme Court precedent requires some sort of direct or indirect pressure to abandon religious beliefs or affirmatively act contrary to those beliefs.") (citing *Lyng*, 485 U.S. at 450). Appreciating the gravity of this conclusion because the proposed development "would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs," the Supreme Court nevertheless made clear that "government simply could not operate if it were required to satisfy every citizen's religious needs and desires" because government activities "will always be considered essential to the spiritual well-being of some citizens, often on the basis of sincerely held religious beliefs." *Lyng*, 485 U.S at 452; *id.* at 453 ("Whatever rights the [Native Americans] may have to the use of the area, however, those rights do not divest the Government of its right to use what is, after all, *its* land.").

Accordingly, while NPS's regulation might interfere with KOC's religious practice—despite KOC conducting its Mass elsewhere in previous years—just like in *Lyng*, KOC has nevertheless failed to show that its religious practice has been burdened for purposes of the Free Exercise Clause.

### b. NPS's Regulation Implements a Neutral and Generally Applicable Requirement Banning all Demonstrations.

Even if KOC had established a burden to its religious exercise, "[t]he Court's free exercise analysis does not end." *Mahmoud*, 2024 WL 2164882, at *8. This is because "[n]ot all burdens on religion are unconstitutional." *Id.* (alteration in original) (quoting *United States v. Lee*, 455 U.S. 252, 257 (1982)). "Under the currently applicable standard set out in *Employment Division v. Smith*, the Supreme Court held that 'laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Id.* (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)). NPS's regulation, which categorically prohibits "demonstrations" in all NPS cemeteries is such a neutral, generally applicable regulation.

To determine whether a law is neutral, this Court "must determine its object." *Alive Church of the Nazarene, Inc. v. Prince William County*, 59 F.4th 92, 108 (4th Cir. 2023) (citing *Lukumi*, 508 U.S. at 534). Per binding precedent, "[i]f a law has 'no object that infringe[s] upon or restrict[s] practices *because* of their religious motivation,' then the law is neutral." *Id.* (alterations in original) (quoting *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 99 (4th Cir. 2013)).

1.      The neutrality analysis starts, but does not end, with the text of the regulation. *Lukumi*, 508 U.S. at 533-534. Under this framework, the NPS regulation establishing the categorical prohibition of all "demonstrations" within the boundaries of a national cemetery is a neutral and generally applicable regulation. The regulation prohibits all "demonstrations," whether they include secular- and religious-based messages. 36 C.F.R. §§ 12.3, 12.4. Indeed, the broad reach of the regulation is plain as it prohibits "picketing, speechmaking, marking, holding a vigil or religious service, or *any other like form* of conduct that involves the communication or expression of views or grievances." *Id.* § 12.3

(emphasis added). This is a religiously neutral regulation, neither favoring one religion over another, nor favoring comparable secular activity over religious activity, which does not trigger strict scrutiny under the Constitution. *See Tandon v. Newsom*, 593 U.S. 61, 62 (2021). Indeed, the core litmus test for this regulation's applicability is whether the activity's principal purpose is to express *any* views or grievances and is likely to draw a crowd or onlookers. ECF No. 1-3 2-3; *Fulton*, 593 U.S. at 533 (strict scrutiny applies when the regulation "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions" (cleaned up)). The content of that message, the purpose of the message, and the secular or religious nature of that message is wholly irrelevant to this determination. EX. 1 ¶ 19 ("I would have denied any permit request to conduct a demonstration within the Cemetery, regardless of whether or not it was religious in nature."). Contrary to KOC's assertion, there is no set of discretionary exemptions for "demonstrations," Mem. at 17, and *Fulton*'s holding does not apply here. That is especially the case now that the 2022 guidance clarified that the regulation's prohibition of "demonstrations" occurring within a national cemetery applies "without exception." ECF No. 1-3 at 2.[4]

Though the definition section of NPS's regulation includes an express mention of "religious service," precedent confirms that express textual references to religious practices do not *per se* trigger

---

[4] While exceptions are made for "special events," KOC's requested activity does *not* meet this definition because the purpose of the activity is clearly to express a view or message. As the evidence shows, NPS has followed the categorical prohibition of "demonstrations" since the guidance document issued. Indeed, first in 2023 and then this year, NPS only permitted KOC's Memorial Day Mass to occur in the First Amendment zone or in an area adjacent to the cemetery. EX. 1 ¶ 18. As precedent also confirms, it is of no moment that the government course-corrects its policy to prohibit conduct it once previously allowed. In *Griffin*, for example, the Fourth Circuit expressly rejected the district court's underlying factual finding that the confederate flag "had flown for several years at [the cemetery] (until the [government] became aware of it), apparently without incident," such that it would be unreasonable for the government to change course and enforce its regulation because the "First Amendment does not preclude the [government] from taking steps to preserve the nature of this nonpublic forum." 274 F.3d 818, 823 (4th Cir. 2001) (collecting cases). In *Lyng* too, the land went undisturbed for a "long time" and the government changed its course, and yet that did not offend the Constitution let alone require a tiers of scrutiny analysis. 485 U.S. at 450-451.

strict scrutiny. *Alive Church of the Nazarene*, 59 F.4th at 110; *Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 1033 (D.N.M. 2020) ("Moreover, that a law mentions religion does not necessarily mean that the law is facially nonneutral."). In *Alive Church of the Nazarene*, the Fourth Circuit expressly declined "to infer from the fact that the Ordinance *explicitly* require[d] religious institutions—along with 34 other nonreligious land uses—to obtain [a permit]" as a basis for heightened scrutiny given the clear object of the Ordinance was "anything other than the one expressly stated therein." 59 F.4th at 110 (emphasis added). There, as here, the text's reference to religion only serves to underscore that *all* expressive activity is encompassed by the regulation and as such, it is a facially neutral one. *See also Hines v. S.C. Dep't of Corr.*, 148 F.3d 353, 357 (4th Cir. 1998) ("If the law makes no distinction between action based on religious conviction and action based on secular views, it is a generally applicable law, neutral toward religion and not violative of the First Amendment.").

KOC sees it differently. In its view, the "policy allows an incredible amount of secular conduct that works against its purported interest." Mem. at 18. This misses the mark in key respects. As an initial matter, KOC has *not* argued (and cannot argue) that this regulation treats secular and religious "demonstrations" any differently, thereby confirming that all prohibited demonstrations, secular and religious alike, are treated equally. First, in conflating the definitions of "demonstrations" and "special events," KOC begins from a flawed premise. Next, KOC overlooks that the activities that constitute "special events" (e.g., sport events, parades, fairs, festivals, etc.) can be *religious* in nature. Special events are not limited, as KOC appears to suggest, to just "secular conduct." *See* Mem. at 18. Nothing in the regulation or guidance requires a permitted "special event" to be secular. 36 C.F.R. § 12.3. Further, "Special Events" also require NPS co-sponsorship, placing the government in the role as a speaker. *Griffin*, 274 F.3d at 822; *see also Rosenberger v. Rector*, 515 U.S. 819, 833 (1995); ECF No. 1-3 at 3 (instructing Superintendents that they "should not consider the content of any communication that is part of the activity" when making "special events" determinations). Once again, this underscores the

evenhanded nature of the regulation: it does not favor one religion over another and does not favor secular special events over religious ones. Finally, KOC again ignores key regulatory provisions—just because a "special event" is permitted in a national cemetery, the special event must nevertheless be *allowed* by the Superintendent. 36 C.F.R. § 12.4. As relevant here, the 2022 guidance memorandum also expressly *prohibits* Superintendents from sponsoring "an event that . . . that is *not* compatible with maintaining the solemn commemorative and historic character of the national cemetery." ECF No. 1-3 at 4. This assures that NPS's interests are furthered when a special event is authorized and comports with the sponsored events at the Cemetery (Memorial Day, Veteran's Day, and a wreath laying in December) by the NPS that clearly further its interest in preserving the solemn atmosphere of the cemetery. *See* EX. 1 ¶¶ 6-9.

All told, regulations like these are neutral for purposes of the Free Exercise Clause. *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614 (6th Cir. 2020) (holding that referencing "'faith-based' mass gatherings" in Governor's order "does not suffice by itself to show that the Governor singled out faith groups for disparate treatment"); *Thai Meditation Assoc of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 825-26, 833-34 (11th Cir. 2020) (holding zoning ordinance was facially neutral despite requiring a "church or religious facility" to obtain approval before locating in a residential district, because the ordinance did not "single out" churches "for unfavorable treatment"; "rather, [the ordinance] lumps them in with other non-religious entities in requiring planning approval for projects in residential districts"); *Lighthouse Fellowship Church v. Northam*, 458 F. Supp. 3d 418, 429 (E.D. Va. 2020) (holding that Governor's Order prohibiting mass gatherings, which included "religious" events was facially neutral because it "prohibit[ed] *all* social gatherings of more than ten individuals, secular and religious"); *Tigges v. Northam*, 473 F. Supp. 3d 559, 571 (E.D. Va. 2020) (Gibney, J.) (holding similar to *Lighthouse*). For purposes of the Free Exercise Clause, NPS's regulation is therefore facially neutral and generally applicable based on its text alone.

2.      Continuing past the text, there no evidence that the "effect of [the] law in its real operation" targets KOC's religious beliefs or religious practices. *Lukumi*, 508 U.S. at 535. Though KOC maintains the Mass is "being prohibited from the National Cemetery due to its religious character, Mem. at 17, the evidence does not support that finding. KOC's own documents themselves make no mention of the rationale for the Superintendent's decisions. *See* ECF No. 1-2, ECF No. 1-6. Rather, because the activity described in KOC's permitting request met the regulatory definition of "demonstration," NPS determined that KOC could only be permitted to conduct its activity adjacent to the Cemetery. EX. 1 ¶¶ 17-18.

        Further, NPS promulgated this regulation for the purpose of preserving the atmosphere of tranquility, which emerged following its agreement to take over management of these cemeteries from the Department of Veterans Affairs and the need to update and standardize operations and procedures across all 14 national cemeteries. *See* 51 Fed. Reg. 8976-77; EX. 3 ¶¶ 3-4. The regulatory history, inclusive of the recent 2022 guidance memorandum, shows that the categorical prohibition of "demonstrations" did not emerge in response to or out of concern of KOC's religious practices. *See* EX. 3 ¶¶ 3-9. As the evidence shows, the need for clarifying that the regulations established a categorical prohibition on "demonstrations" emerged in the wake of "several permitted and unpermitted Ku Klux Klan events" that occurred at Gettysburg National Military Park and based on observations from NPS officials that the "parks were not consistently following the regulations in managing activities within National Cemeteries." EX. 3 ¶¶ 5-9. Notably, KOC does not (and cannot) contend that the historical record, starting with the promulgation of the regulations in 1986 and continuing through the issuance of the guidance memorandum in 2022, was done out of religious-based animus. All this confirms that strict scrutiny has not been triggered. *See Lukumi*, 508 U.S. at 526, 535 (holding facially neutral statute was unconstitutional given the evidence that it was enacted based upon the expressly cited concerns with the Santeria's practice of sacrificial animal killings). Moreover,

nothing in the record evinces any faith-based animus by NPS officials, further highlighting that strict scrutiny is not warranted here. *See Masterpiece Cakeshop, Ltd. v. Colo. Civil Rts. Comm'n*, 584 U.S. 617, 636 (2018) (applying strict scrutiny where adjudicatory record showed comments evidencing a hostility to faith practices that went uncorrected and unaddressed by subsequent reviewing officials once made).

All told, the evidence shows that, at most, this regulation might impact KOC's preferred site, but it "does so 'in spite of' and not 'because of those [individuals'] religious reasons." *Kim v. Bd. of Educ. of Howard Cnty.*, 93 F.4th 733, 748 (4th Cir. 2024) (holding that Maryland statute limited pool of student school board members to students who only attended public schools, which equally excluded students attending either private-secular or private-religious schools from eligibility, was a "neutral and generally applicable government action").

3.      Thus, as a neutral and generally applicable regulation, 36 C.F.R. § 12.4 does not offend the Free Exercise Clause. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006). The regulation is therefore only subject to rational basis review, *Mahmoud*, 2024 WL 2164882, at *8, which it easily clears. Prohibiting all demonstrations furthers the government's interest in maintaining a national cemetery's protective atmosphere of "peace[,] calm, tranquility and reverence" such that "individuals can quietly contemplate and reflect upon the significance and contributions made to the nation by those interred." 51 Fed. Reg. at 8977; *see also Oberwetter v. Hilliard*, 639 F.3d 545 (D.C. Cir. 2011) (noting government's interest in "promoting a tranquil environment at our national memorials"); *Griffin v. Dep't of Veterans Affs.*, 274 F.3d 818, 821 (4th Cir. 2001) (reversing district court which enjoined Veterans Affairs from enforcing its regulation limiting the confederate flag to be displayed for no more than two days per year, and otherwise only permitting the American flag to be flown because that regulation further the government's purpose "to honor, as Americans, in tranquil and nonpartisan surroundings, those who have given their lives to the Nation"). NPS's intended goal for the Cemetery, like other national cemeteries, is to promote an atmosphere of silence and

reverence—permitting demonstrations of any kind undermines that objective. Therefore, KOC is not likely to succeed on its Free Exercise claim.

### 2.    KOC Is Unlikely to Succeed on Its RFRA Claim.

KOC is not likely to succeed on its claim for relief under RFRA either. Enacted in 1993, RFRA prohibits the Federal Government from substantially burdening a person's exercise of religion unless the government demonstrates that application of the burden furthers a compelling government interest and is the least restrictive means of furthering that compelling government interest. 42 U.S.C. § 2000bb-1; *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694-95 (2014). KOC's RFRA claim, like its Free Exercise claim, fails to establish a key showing for all RFRA claims: that the challenged government action places a substantial burden on its free exercise of religion. And even if KOC established a substantial burden to its exercise of religion, the NPS regulation is narrowly tailored to advance the government's compelling interest in protecting the solemn atmosphere of the Cemetery.

### a.  There Is No Burden or Substantial Burden to KOC.

RFRA restored, as a matter of federal statutory right, the broader protection of religious exercise exemplified in the Supreme Court's earlier decisions in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). 42 U.S.C. § 2000bb(b)(1). In *Sherbert*, the Court held that South Carolina's denial of unemployment benefits to a Seventh-Day Adventist fired for refusing to work on Saturdays placed "the same kind of burden upon the free exercise of religion as would a fine imposed against [her] for her Saturday worship," 374 U.S. at 404, and that no compelling governmental interest justified imposing that burden. *Id.* at 406-407. And in *Yoder*, the Court held that no sufficient State interest justified Wisconsin's compulsory schooling law, which "unduly burden[ed]" the religious exercise of Amish parents and children by "compel[ling] them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Yoder*, 406 U.S. at 218, 220. RFRA reinstates the *Sherbert/Yoder* test legislatively.

19

As part of any RFRA claim, a plaintiff must establish that the government exercised the coercive power of the state against the plaintiff to deter or punish the conduct constituting the plaintiff's religious exercise; RFRA does not, as KOC suggests, inquire how seriously the government's action offends or conflicts with the plaintiff's religious exercise. *See* Mem. at 12; *see, e.g., Liberty Univ.*, 733 F.3d at 100 (examining whether plaintiff met showing that healthcare mandate required by the Affordable Care Act caused "substantial pressure on an adherent to modify his behavior and to violate his beliefs" and holding they could not because they could comply with statute by paying the tax).

As *Liberty University* and Supreme Court precedent confirm, this assessment is not based on whether the *conflict* with one's religious exercise was severe, significant or substantial, but whether the *consequences* resulting from the ensuing violation issued by the government are. *Burwell*, 573 U.S. at 726 ("Because the contraceptive mandate forces them to pay an enormous sum of money . . . if they insist on providing insurance coverage in accordance with their religious beliefs, the mandate clearly imposes a substantial burden on those beliefs."); *Holt v. Hobbs*, 574 U.S. 352, 361 (2015) ("If petitioner contravenes the policy and grows his beard, he will face serious disciplinary action."). Considering this jurisprudence, and Congress's general intent to restore the jurisprudence to before *Smith*, the coercion/burden principles that pre-date *Smith* are also still captured by RFRA's enactment. *See Apache Stronghold v. United States*, 2024 WL 2161639, at *18-20 (9th Cir. May 14, 2024) (en banc) ("Accordingly, RFRA's understanding of what counts as substantially burdening a person's exercise of religion must be understood as subsuming, rather than abrogating, the holding of *Lyng*. That holding therefore governs [plaintiff's'] RFRA claim as well . . . .").

And recently, the Fourth Circuit just confirmed that "[b]efore *Smith*" (*i.e.*, the jurisprudential framework RFRA adopted), the Supreme Court required "plaintiffs to show that a challenged government action 'substantial[ly] burden[ed] religious exercise." *Mahmoud*, 2024 WL 2164822 at *9 n.12 *accord Am. Life League, Inc. v. Reno*, 47 F.3d 642, 655 n.6 (4th Cir. 1995). Accordingly, *Lyng* (a pre-

*Smith* decision) is part of the RFRA framework, and as discussed at lengthy above, the Supreme Court there held that the Native American tribes did not meet that threshold burden showing. 485 U.S. at 450-51. All told, if there is no burden to KOC's religious exercise, it follows *a fortiori*, that there can be no *substantial* burden to one's exercise of religion. Therefore, KOC it not likely to succeed in establishing a "substantial burden" on its religious exercise within the meaning of RFRA.

But even assuming KOC has shown there is *a* burden of some degree to its religious exercise, it is not a *substantial* one. In making that assessment, courts examine how the plaintiff has been practicing their faith in the absence of the challenged government action. *See, e.g.*, *Godbey v. Wilson*, 2014 WL 794274, at *8 (E.D. Va. Feb. 26, 2014) (Ellis, J.) ("Thus, because plaintiff has never practiced Asatru other than by using non-alcoholic mead and restricting the wearing of his hlath only to religious services, the policies at issue cannot have compelled him to modify his behavior."); *Bermea-Cepeda v. Chartier*, 2012 WL 2366437, at *4 (D.S.C. May 8, 2012) ("Plaintiff concedes he has been told he has access to personal religious and devotional materials and has been able to individually practice his religion in his cell.").

As the evidence here shows, there have been years in which KOC has not held a Mass within the Cemetery. Indeed, just last year the Mass was held indoors at KOC's Council Home due to the weather, ECF No. 1-10 at 5, and in 2016, KOC planned to host its Mass in a state cemetery until it relocated the event to its Council Home to due weather, EX. 4. Even KOC acknowledges that, when the cemetery was "closed for renovations," the group did not hold a Mass within the Cemetery. Mem. at 12.[5] Thus, it cannot be said that the challenged regulation compels or otherwise coerces KOC to surrender its religious beliefs. Whether because of cemetery renovations or bad weather, KOC has adjusted its practice to conduct Masses elsewhere, thereby underscoring that NPS's regulation has not

---

[5] KOC does not appear to have made any challenge to NPS's decision to renovate the cemetery or to have previously contended that NPS was required to reserve part of the Cemetery to ensure the Mass could continue notwithstanding the renovations.

otherwise compelled KOC to surrender its beliefs or face significant consequences. Though KOC notes these were decisions to "cut their losses," Mem. at 13, caselaw is nevertheless clear that the challenged regulation is not otherwise compelling or coercing a violation of their beliefs. *See, e.g.*, *Godbey*, 2014 WL 794274, at *8; *Bermea-Cepeda*, 2012 WL 2366437, at *4.

> **b. NPS's Regulation Furthers a Compelling Government Interest that is Narrowly Tailored and Thus Survives Strict Scrutiny.**

"To pass the [strict scrutiny] test a law must be necessary to serve compelling governmental interests by the least restrictive means available." *Am. Life League, Inc.*, 47 F.3d at 648. Whether "something qualifies as a compelling interest is a question of law." *McRae v. Johnson*, 261 F. App'x 554, 557 (4th Cir. 2008); *accord Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 93 (1st Cir. 2013); *Sabir v. Williams*, 52 F.4th 51, 62 (2d Cir. 2022). As caselaw shows, the government can advance compelling interests in the context of RFRA and Religious Land Use and Institutionalized Persons Act ("RLUIPA") claims based on the needs of structures and impacts on the surrounding area. *See, e.g.*, *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 634 (7th Cir. 2007) (holding that expansion of airport furthered a compelling interest regarding air transportation in the region); *WTC Families for a Proper Burial, Inc. v. City of New York*, 567 F. Supp. 2d 529, 540-541 (S.D.N.Y. 2008) (holding government interest in efficiently and economically sifting through the debris caused by the fall of the World Trade Centers on September 11, 2001 was compelling interest).

NPS has advanced a compelling interest for the categorical prohibition of "demonstrations" within national cemeteries: ensuring the continued maintenance of a "protected atmosphere" of "peace[,] calm, tranquility, and reverence" such that "individuals can quietly contemplate and reflect upon the significance of the contributions made to the nation by those interred." 51 Fed. Reg. at 8977; ECF No. 1-2 at 1. Absent the advancement of this interest, national cemeteries become overwhelmed by any and all activities, losing their desired environment of serenity and reverence. *Oberwetter*, 639 F.3d at 552 ("National memorials are places of public commemoration, not freewheeling forum for

open expression, and thus the government may reserve them for purposes that preclude expressive activity."). KOC appears to agree with this analysis. *See* Mem. at 14.[6] KOC concedes that it "do[es] not need to litigate" whether the advanced interest is compelling given that "they too wish to promote an atmosphere of quiet contemplation and reflection in the National Cemetery." Mem. at 14. To further this compelling interest, NPS granted KOC's request with a narrowly tailored modification. That is, NPS permitted KOC's "demonstration" in an area adjacent to the cemetery's boundaries— especially considering that the requested demonstration contemplated approximately 45 people, enough cars to more than fill the cemetery's entire parking lot, a tent, chairs, and a Bluetooth speaker for sound amplification. EX. 1 ¶ 15. That alternative was meaningful given that NPS officials understood, and the evidence also confirms, that KOC observed its sincerely held beliefs to hold a Memorial Day Mass in locations *other than inside* the Cemetery. EX. 1 ¶ 18.

Resisting this conclusion, KOC first notes that "[t]here is certainly no substantial difference between their [requested Mass] and a graveside committal service." Mem. at 14. While the regulations permit committal services as a general matter to occur, 36 C.F.R. § 12.4, committal services no longer occur at the Cemetery as it is no longer an active cemetery. EX. 1 ¶ 4. Thus, this argument is inapplicable as applied to the Cemetery and any inactive national cemetery. *See* 51 Fed. Reg. at 8976.

Next, KOC cites the fact that its Memorial Day Mass has continued in the cemetery for "almost 40 years"—notwithstanding instances when the Mass was held elsewhere—as another basis that strict scrutiny is in applicable. Mem. at 15. True enough; KOC's Memorial Day Mass appears to have occurred in the past. But unless NPS uniformly enforces a categorical ban on demonstrations, it otherwise exposes itself to the prior regime the guidance memorandum sought to eliminate—

---

[6] It is of course of no moment that NPS, nearly 40 years ago, described its interest as "substantial" in the promulgation overview. 51 Fed. Reg. at 8977. If an interest is "compelling" it is necessarily substantial in nature, and NPS's choice of word does not change this Court's constitutional and/or RFRA analysis.

inconsistent determinations concerning permitted and unpermitted demonstrations. EX. 3 ¶¶ 7-8. And this is a weighty and compelling concern, because whether viewed from a Free Exercise or Free Speech perspective, *ad hoc* exceptions for any one particular group lead to the perception (or conclusion) that NPS is engaging in viewpoint discrimination—favoring one message (and in this instance a religious one) over another. To avoid that outcome and continue to preserve the compelling interest of an atmosphere of silence and reverence, only a categorial ban of "demonstrations" is narrowly tailored to suit that need. *Griffin*, 274 F.3d at 824 (citing *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 685 (1992)). For if KOC "is given access, so too must other groups." *Int'l Soc. for Krishna*, 505 U.S. at 685 (upholding regulation ban on solicitation in airport terminals against not-for-profit religious corporation who challenged the regulation through a Free Speech claim); *accord Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 654 (1981).

In sum, NPS's decision to permit Plaintiff to conduct its demonstration adjacent to the cemetery was narrowly tailored and advanced a compelling interest. KOC's RFRA claim is therefore not likely to succeed on the merits.

### 3. KOC Is Unlikely to Succeed on Its APA and Free Speech Claims.

In a few throw away lines, KOC proclaims that it has "strong merits claims" under the APA and for a purported violation of the Free Speech Clause. Mem. at 19. Of course, the standard for the extraordinary and disfavored relief of a mandatory injunction is not based on the party's assertion they have "strong claims," but on actual *evidence*. *Mahmoud*, 2024 WL 2164882, at *6. Given that KOC has not devoted much attention to these claims, Defendants will likewise provide a brief explanation as to why KOC is not ultimately likely to succeed on the merits of these claims.

**APA Claims.** As to the APA claims, it is KOC's burden to show that the NPS's permitting decision was arbitrary, capricious, or contrary to law. *Platone v. U.S. Dep't of Labor*, 548 F.3d 322, 326 (4th Cir. 2008). Here, NPS determined that KOC requested to engage in a categorically prohibited

24

"demonstration" within the meaning of its regulations. EX. 1 ¶¶ 17-18; 36 C.F.R. §§ 12.3, 12.4. As part of that determination, NPS concluded that KOC's requested activity involved a communication or expression of views and was likely to draw onlookers. EX. 1 ¶ 18; ECF No. 1-3 at 3. It is not seriously disputed that the entire purpose of a Catholic Mass is to convey a view or message. Even KOC has not contested that conclusion; instead focusing its argument on the fact that regulation expressly listed "religious service" as a type of "demonstration." Mem. at 9-10. Moreover, as the recent guidance memorandum highlights, "the use of amplification and structures, such as stages, creates a presumption that an activity is reasonably likely to attract a crowd or onlookers." ECF No. 1-3 at 3. And KOC's request included, among other things, "a tent, a Bluetooth speaker for sound amplification, [and] 50 chairs." EX. 1 ¶ 15. Thus, under the regulation, KOC's request fell subject to the presumption that it had to overcome. Moreover, NPS determined, given the requested items and anticipated crowd size, that it was nevertheless reasonable that the activity was going to cause onlookers or draw a crowd. *See* EX. 1 ¶ 18. Given that "substantial evidence"—that is, "evidence as a reasonable mind might accept as adequate to support a conclusion" supports NPS's determination, the agency's decision may not be disturbed on APA review. *Platone*, 548 F.3d 322. Finally, for the reasons discussed herein, NPS's determination is not otherwise in violation of federal law or the Constitution. Accordingly, KOC is not likely to succeed on its APA claim.

**Free Speech Claim.** Undoubtedly, the Cemetery is a nonpublic forum, and thus NPS may place any reasonable and viewpoint-neutral restriction on speech that furthers the purpose of that forum. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800, 806 (1985). Here, the purpose of this forum, a national cemetery, is to honor America's gallant war heroes. *Griffin*, 274 F.3d at 821; *see also Oberwetter*, 639 F.3d at 552 (holding that public memorials are nonpublic forums). The Cemetery is not intended for open public access and expression. Thus, if NPS's regulations are viewpoint neutral and reasonable in light of the forum, there is no violation of the Free Speech Clause

of the First Amendment. *Griffin*, 274 F.3d at 822. Under this "deferential" standard, NPS's speech restrictions, "need not be the most reasonable or the only reasonable limitation." *Id.* at 822. NPS's regulations meet this standard. As clarified by the 2022 guidance, NPS's regulations and their application promote an intended message (silence) within a forum that is designated to maintain an "atmosphere of peace, calm, tranquility, and reverence." ECF No. 1-3 at 1. Moreover, eliminating all demonstrations and special events, with the exceptions of those three dates identified by the Cemetery's superintendent reasonably furthers that interest. EX. 1 ¶¶ 6-9. Per precedent, this is a reasonable regulation furthering NPS's interests. *Griffin*, 274 F.3d at 824.

B. <u>Factor 2: KOC cannot show it will be irreparably harmed absent an injunction.</u>

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis added). Conclusory or speculative allegations do not establish a likelihood of irreparable harm. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991); *see also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) ("The plaintiff must make a clear showing of irreparable harm and the required irreparable harm must be neither remote nor speculative, but actual and imminent."). Courts have also recognized that irreparable harm does not exist where plaintiffs allege harms to their ability to hold events or communicate ideas, but where there are alternative forums are made available to those same plaintiffs. *See, e.g.*, *Johnson v. City & Cnty. of Philadelphia*, 2008 WL 1776421, at *2 (E.D. Pa. Apr. 18, 2008) (holding a lack of irreparable harm where plaintiff was prohibited from putting in posters in certain locations but could post posters in other locations and had "alternative relatively inexpensive forms of communication"); *Am. Future Sys., Inc. v. Pennsylvania State Univ.*, 510 F. Supp. 983, 988 (M.D. Pa. 1981) ("The Court fails to see how regulations that merely control the location of an activity constitute irreparable harm since the Plaintiffs are free to conduct the activities they wish at other locations in close proximity to the

residence halls.").

Here, KOC suffers no irreparable harm because NPS issued it a permit to hold services on NPS land just outside of the Cemetery's walls. Thus, while KOC may not hold its gathering in the exact location KOC held its gathering prior to 2023, it can nonetheless hold a ceremony still just outside the gates of, and on the approaches to the cemetery. This alternative location for worshiphighlights that irreparable harm is lacking. *See, e.g.*, *Stewart v. City & Cnty. of San Francisco, California*, 608 F. Supp. 3d 902, 918 (N.D. Cal. 2022) (holding "that plaintiffs fail[ed] to demonstrate irreparable harm . . . given the . . . alternative means available for worship"). While KOC suggests that the alternative location is not an adequate substitute and that the service they seek to hold must be held within the sacred ground of the cemetery, KOC provides no further assertion for this point or why the alternative location is not an adequate substitute. *See Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 543 (E.D.N.C. 2020) ("bare assertion" insufficient to obtain injunctive relief).

For one, the alternative location is directly next to the Cemetery, allowing KOC to hold the kind of memorial honoring and praying for soldiers that it would like. For another, the available record suggests that KOC itself has engaged in conduct indicating that it does not believe its ceremony *must* be held in the sacred ground of the Cemetery. Indeed in 2023 when KOC was authorized to hold a service at the same location as they are now, KOC elected to hold its Mass at its Council Home, and during years in which the Cemetery was under renovation, KOC had previously held services elsewhere. *See Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) ("[A] preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action."). Presumably if KOC truly suffers irreparable harm from not holding its services in the Cemetery, it would not have held services elsewhere in the past or taken action to ensure it could hold services during the renovation, and yet KOC took neither action. Furthermore, it is not clear why KOC believes the specific ground in the

27

Cemetery must be the location for its services given that KOC has previously proposed holding its Memorial Day ceremony at a different *state* cemetery. *See* EX. 4.

For its part KOC puts the cart before the horse and claims it suffers "irreparable injury *per se*" because it has shown a loss of First Amendment freedoms. Mem. at 19-20. But, as discussed herein, KOC cannot show a violation of the Free Exercise Clause or RFRA, and it barely even argues that the viewpoint-neutral application of NPS' regulations in a nonpublic forum violates the Free Speech Clause. *See id.* at 19. Moreover, KOC's ability to still hold its Mass adjacent to the Cemetery—just not physically in front of a gravesite—and its willingness to hold its Mass elsewhere highlights that there have been no grave loss of First Amendment freedoms. Indeed, KOC's cited cases for the loss of constitutional freedom are glaringly inapposite. *Cf. Elrod v. Burns*, 427 U.S. 347, 360 (1976) (involving the "practice of patronage dismissals" where public employees were fired for not supporting a particular political party); *Singh v. Berger*, 56 F.4th 88, 110 (D.C. Cir. 2022) (involving an instance where plaintiffs could not join the Marine Corps without shaving their hair in violation of their Sikh beliefs); *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (involving a Fourth Amendment violation where an aerial surveillance program invaded privacy interests could "reveal where individuals come and go over an extended period").

Thus, KOC cannot show irreparable harm as it has an alternative, immediately adjacent forum for holding its services at the Cemetery, and its own prior conduct evinces the point that KOC was not harmed in the past by holding its services in areas not even adjacent to the Cemetery. *See also Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (holding a party was not entitled to a preliminary injunction where it filed suit long after it became aware of a policy it disagreed with).

    C.    <u>Factors 3 & 4: The balance of equities and the public interest favor Defendant.</u>

Finally, to be entitled to the preliminary injunctive relief they seek, KOC must show that the balance of equities tips in its favor and that an injunction is in the public interest. Where, as here, the

injunctive relief is sought against the federal government and implicates a matter of great public interest such as the interest of the federal government in the maintenance and solemnity of national grave sites, these two factors overlap and may be considered together. *Nken v. Holder*, 556 U.S. 418, 436 (2009). Here, the balance of the equities and the public interest favor the government. As courts have observed in analogous circumstances, "[p]reserving national park areas for noncommercial activity, public enjoyment, and wildlife protection is a paramount public interest." *San Francisco Herring Ass'n v. United States Dep't of the Interior*, 2014 WL 172232, at *7 (N.D. Cal. Jan. 15, 2014); *see also Washington Tour Guides Ass'n v. Nat'l Park Serv.*, 808 F. Supp. 877, 880 (D.D.C. 1992). Here, the public interest is even higher than in general park land—maintaining a protected atmosphere of peace, calm, tranquility and reverence in a national cemetery by NPS ensuring that no demonstrations take place in that cemetery, and in maintaining the status of the Cemetery as a nonpublic forum rather than opening it to every from of demonstration and protest.

That interest is particularly amplified here where KOC seeks to hold an event numbering some 45 people with audio equipment and other equipment that would undoubtedly affect that atmosphere. As courts have observed in like circumstance with the NPS, NPS has weighty interests in maintaining its parks and spaces and safeguarding them when weighed against members of the public who wish to use those same spaces in a manner that compromises that maintenance. *See Ketcham v. U.S. Na"l Park Serv.*, 2016 WL 4269037, at *6 (D. Wyo. Feb. 5, 2016) (holding that the public interest favored NPS closing off the public's access to observe bison culling activities given NPS's interest in preserving order and safety in a park); *see also Cmty. for Creative Non-Violence v. Watt*, 1982 WL 3915, at *13 (D.D.C. Dec. 9, 1982) ("We also conclude that the public interest and the interest of defendants in administering the national park areas outweigh any interests invoked by plaintiffs in support of their motion for a preliminary injunction."). Indeed, the Fourth Circuit itself has recognized the government's interests in imposing restrictions in a national cemetery, noting such restrictions may be

29

warranted "in light of the nature of the particular forum, a cemetery dedicated to honoring, as Americans, the Nation's war dead." *Griffin*, 274 F.3d at 824; *see also id.* at 821 ("We agree with the VA that [the cemetery's] purpose is to honor, as Americans, in tranquil and nonpartisan surroundings, those who have given their lives to the Nation.").

In its Memorandum, KOC again gets ahead of itself and trots out the argument that the public interest favors an injunction because it is certainly going to be successful on its claims. Mem. at 21. As previously noted, KOC is not likely to succeed on the merits of its claims. KOC at best argues that its injunction "preserv[es] the *status quo ante*" whereby KOC was allowed to hold its Mass in front of the grave sites at the Cemetery in previous years. Mem. at 20. That was not the *status quo ante*, however. As courts have explained, "[t]he 'status quo' for purposes of classifying the nature of an injunction is the 'last uncontested status between the parties which preceded the controversy.'" *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F. Supp. 3d 556, 566 (E.D. Va. 2016) (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012)). And in the instant case, the *status quo ante* before this lawsuit and KOC's complaints regarding its 2024 permit was NPS's previous decision in 2023 to allow KOC to hold its activity adjacent to the cemetery—a decision KOC did not dispute or challenge at the time. Thus, KOC's sought injunction does not preserve any existing status quo between the parties but seeks to require affirmative relief and preclude NPS from applying its regulation. *See Clear Channel Outdoor, Inc. v. City of New York*, 608 F. Supp. 2d 477, 492 (S.D.N.Y. 2009) ("Plaintiffs seek to alter the status quo by preventing the City from enforcing a duly enacted regulation"). Thus, these separate factors support denying KOC's motion for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny KOC's Motion for Preliminary Injunction.

Dated: May 22, 2024                                    Respectfully submitted,

JESSICA D. ABER
United States Attorney

By:    /s/_____
YURI S. FUCHS
MATTHEW J. MEZGER
Assistant United States Attorneys
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3872/3741
Fax:    (703) 299-3983
Email:  yuri.fuchs@usdoj.gov
        matthew.mezger@usdoj.gov
        *Counsel for Defendants*